2023 IL App (1st) 220657

THIRD DIVISION
April 26, 2023

No. 1-22-0657

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| SHAHID MASOOD, M.D., | ) | Appeal from the |
| | ) | Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 21 CH 05718 |
| THE DIVISION OF PROFESSIONAL REGULATION | ) | |
| OF THE DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION, and CECILIA | ) | |
| ABUNDIS, in Her Official Capacity as Acting | ) | |
| Director of the Division of Professional Regulation, | ) | |
| | ) | Honorable |
| | ) | David B. Atkins, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      In this case, plaintiff, Shahid Masood, M.D., was found to have violated the Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 60/1 *et seq.* (West 2020)). and the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2020)) based on findings that he excessively overprescribed controlled substances over extended periods of time to two patients with underlying substance abuse issues. Based on those violations, the acting director (Director) of the Division of Professional Regulation of the Department of Financial and Professional

Regulation (Department) indefinitely suspended Masood's medical licenses for a minimum period of two years. Masood appeals.

¶ 2    The record shows that Masood is a physician holding a physician and surgeon license and a controlled substance license, both issued by the Department, an administrative agency tasked with licensing and regulating professions and trades, including physicians in Illinois. See 20 ILCS 2105/2105-1 *et seq.* (West 2020); 225 ILCS 60/1 *et seq.* (West 2020).

¶ 3    In 2018, the United States Drug Enforcement Administration (DEA) investigated Masood regarding his narcotic prescription practices. The investigation ultimately resulted in Masood entering into a memorandum of agreement with the DEA on October 3, 2018, which among other things, restricted his ability to prescribe schedule II controlled substances for three years.

¶ 4    Meanwhile, the Department filed an administrative complaint against Masood on August 17, 2018, and an amended administrative complaint, thereafter, on March 4, 2019. The amended complaint alleged (1) that Masood improperly prescribed very large amounts of several controlled substances—totaling more than 750,000 tablets over a two-year period—to multiple patients at his practice, including out of state patients; (2) that Masood engaged in improper care of patient S.J.; (3) that Masood improperly treated S.W.—a registered nurse employed by Masood with a history of substance abuse—by prescribing her excessive quantities of controlled substances and failing to monitor her drug use; and (4) that Masood improperly treated patient M.S.—an Ohio resident who traveled to be treated by Masood—by failing to evaluate him for warning signs of addiction and continuing to prescribe him excessive quantities of controlled substances.

¶ 5    The matter proceeded to a hearing over the course of several days before an administrative law judge (ALJ). At the outset of the hearing, the Department withdrew the second count against Masood regarding patient S.J. Later, during the course of the hearing, the Department was given

leave to file a second amended complaint, adding a fifth count alleging that Masood failed to comply with an October 2018 subpoena by not providing complete copies of S.W. and M.S.'s medical records.

¶ 6     The Department first called Masood as an adverse witness, questioning him initially as to his care of patient S.W. Masood testified that S.W. was employed as a nurse in his office beginning in June 2016. Masood acknowledged that S.W. was on probation by the Department for substance abuse at the time she was employed with his practice, but Masood claimed that he was unaware of that probation.

¶ 7     S.W. was initially seen by another doctor in his practice to obtain an Adderall prescription (a schedule II stimulant), on March 6, 2017. Two days later, on March 8, 2017, S.W. was admitted to the emergency room where she was suspected mixing of controlled substances and alcohol. Masood testified that he saw her during the hospital visit, but he did not write in the records for that hospital stay that she was an employee of Masood's practice, that she had been prescribed Adderall by a partner in his practice, or that she was mixing alcohol and controlled substances.

¶ 8     After the hospital stay, S.W. had several visits with another doctor in Masood's practice, and the medical records of those visits did not include any documented issues with pain or abnormalities. A range of motion test was conducted by another doctor in April 2017, with normal results. The other doctor saw S.W. several more times until September 2017, and never noted any pain or discomfort.

¶ 9     In October 2017, Masood had his first office visit with S.W., during which he noted that she had discomfort in her left shoulder and lumbar spine. Masood claimed he consulted her prescription monitoring profile, which would have indicated what prescription medications she had been prescribed in the past, but he did not document doing so. Other than checking the

3

prescription monitoring profile, Masood did not make any other effort to obtain her prior medical information, explaining that he believed he had all he needed and that he did not intend to keep her as a long-term patient.

¶ 10    At that first office visit, Masood prescribed her 210 tablets at 30 milligrams of oxycodone (a schedule II opioid) and 90 tablets at two milligrams of Xanax (a schedule IV benzodiazepine). Masood admitted on cross-examination that he did not document any of these prescriptions in the office notes, only in a separate medication log. Masood claimed that he was just continuing medications that had already been prescribed to S.W. by a pain clinic, but he admitted that there was nothing in the records that showed he verified any prior treatment. Masood also testified that he did not ask S.W. to do a drug screen or a urine test when she first came to him as a patient.

¶ 11    Less than two weeks after S.W.'s visit with Masood, S.W. saw another doctor in Masood's practice. That doctor performed another range of motion exam, again not noting any limitations on movement consistent with the discomfort Masood noted, and nothing in the other doctor's notes indicated shoulder or lumbar spine discomfort. At her next visit with Masood two weeks later, however, Masood increased her monthly oxycodone prescription from 210 tablets to 240, without any documented physical exam.

¶ 12    In November 2017, Masood also prescribed S.W. 120 tablets at 350 milligrams of Soma (a schedule IV muscle relaxant) with five refills. Two months later, on January 4, 2018, S.W. called Masood, who then wrote her another Soma prescription, this time for 140 tablets at 350 milligrams with 11 refills, intended to be refills for the entire year.

¶ 13    Meanwhile, on December 18, 2017, S.W. came for an early office visit. Masood increased the number of monthly Xanax tablets from 90 to 100 at 30 milligrams and continued the same oxycodone and Adderall prescriptions.

¶ 14    On January 15, 2018, S.W. was seen by Masood at an office visit. Masood again wrote her prescriptions for 240 tablets of oxycodone at 30 milligrams and 60 tablets of Adderall at 30 milligrams, while increasing her Xanax prescription to 120 tablets at two milligrams. He prescribed the same at office visits in February and April 2018 and by phone in March 2018. At a May 3, 2018, office visit, Masood noted that she had some discomfort in her lumber spine. Masood acknowledged during his testimony that he did not document any issue with her shoulder, which meant that it must have been better. Masood, however, continued the same treatment regimen but noted that she was depressed and added Zoloft—an antidepressant—and Deplin—a vitamin that makes Zoloft more effective. Later that month, Masood voluntarily surrendered his DEA registration while he was under investigation with the DEA.

¶ 15    Masood testified that he was aware of the dangers of prescribing Soma, oxycodone, and Xanax together and acknowledged that it could suppress an individual's respiratory system. Masood also testified that he was aware of the 2016 Centers for Disease Control and Prevention (CDC) guidelines for pain management. These guidelines calculate a morphine milligram equivalent (MME), which provides a numeric value for opioids prescribed and a recommended limit. Masood admitted that he was aware of the MME conversions and that doctors should avoid prescribing 90 milligrams of opiate therapy daily or more. He acknowledged that S.W.'s oxycodone prescription alone was the equivalent of over 300 MME. He also added a Xanax prescription to S.W.'s regimen, 90 tablets monthly, and admitted that CDC guidelines state that one should be careful when prescribing oxycodone with benzodiazepines such as Xanax. Masood claimed, however, that the above guidelines did not apply to S.W. because they were only for "new patients" and not for patients with chronic pain, but he acknowledged again that he did not document anything about his knowledge of her prior usage.

¶ 16    Masood also testified he treated three members of the "S" family from Toledo, Ohio. Masood began seeing one member, M.S., in July 2009 and certified him as homebound, even though M.S. understood that he lived in Toledo, Ohio, visited family in Chicago, and regularly visited Masood's office in Joliet, Illinois. Masood prescribed M.S. a series of controlled substances: 150 tablets of Percocet (a Schedule II opioid), 60 tablets of oxycodone at 20 milligrams, and 90 tablets Xanax at two milligrams. Masood testified that he kept this regimen from March or April 2013 until January 2018.

¶ 17    Meanwhile, on March 20, 2017, Masood received a call from M.S.'s son and daughter-in-law telling him that M.S. had been found unresponsive with a packet of white powder. The daughter-in-law told Masood that M.S.'s house burned down when he was under the influence, that he was possibly using heroin, that he was involved in selling prescription drugs, and that she wanted Masood to stop prescribing him pain medication. The daughter-in-law also said that M.S. was erratic, angry, belligerent, and a danger to himself and others. Masood then sent M.S. a letter, dated March 21, 2017, telling M.S. that Masood would no longer prescribe controlled substances to individuals who resided outside of Illinois and also that he could not continue to prescribe him medications given the possibility that M.S. was involved in criminal activities.

¶ 18    About three weeks later, on April 11, 2017, M.S. came to Masood's office. Masood testified that M.S. was accompanied by two sisters, one of whom was his power of attorney, and they told Masood that the daughter-in-law was "making up stories" and that M.S. was taking the medications as prescribed and not selling or abusing them. Masood, however, did not document that any other family members were present or anything else about this discussion. During this visit, M.S. also reported that his medication had been stolen. Masood testified that M.S. had on at least one prior occasion called the office to say that his medications had been stolen and once to

6

say that he had lost his prescription. Masood did not document anything in his notes about addressing the termination letter with M.S., and he did not do a drug screen during that office visit. Masood admitted that he continued to prescribe controlled substances to M.S. for another eight or nine months after the March 2017 letter.

¶ 19   On November 7, 2017, Masood's office received a phone call from M.S.'s son, informing him that M.S. had overdosed the previous day, that he was at a hospital in Ohio, that he was put on Suboxone—a medication used to treat opiate addiction, and that the family was concerned that M.S. was abusing and selling drugs.

¶ 20   On December 4, 2017, M.S. reported to Masood that he was in a hospital for treatment for depression. Masood testified that he trusted M.S. that his hospitalization was for depression and that he "was not aware of the addiction part." Masood did not make any efforts to verify M.S.'s report or to obtain any medical records regarding M.S.'s hospitalization.

¶ 21   On December 28, 2017, Masood's practice received an e-mail from M.S.'s daughter-in-law, in which she wrote that she was "document[ing] [her] continued effort to make Dr. Masood aware that [her] father [ ] has been selling and abusing his medications, which [she] fe[lt] [we]re being overprescribed by Dr. Masood." The daughter-in-law outlined that M.S. had suffered multiple overdoses and hospitalizations, was in car accidents, and was arrested for intent to sell oxycodone, all resulting from M.S.'s ongoing addiction. The e-mail further stated that Masood had been aware of M.S.'s circumstances since March 2017.

¶ 22   On January 4, 2018, M.S. came to Masood's office. At that time, Masood gave M.S. a termination letter that stated that Masood's office would no longer provide medical services, prescribe medication, or treat M.S. in the office. Masood gave M.S. a one-month supply of medication and discharged him from his care.

¶ 23    The Department's expert, Dr. Asokumar Buvanendran, testified that he is a physician board-certified in anesthesiology and pain management and was appointed as the representative from the American Society of Anesthesiologists to work on the initial review of the 2016 CDC guidelines for pain management. Dr. Buvanendran testified that those guidelines applied to patients with chronic pain. Dr. Buvanendran testified that, for patients complaining of pain, a physician should first try "non-pharmacology therapies," and then non-opioid medications, before opioid medications are considered. Then, if opioid medications are required, a physician should start patients on the "lowest effective dose." He further explained that it is important for doctors to conduct risk assessments and to monitor patients on pain management through methods such as examining the Illinois Prescription Monitoring Program (PMP) to determine if the patient has been prescribed similar controlled substances from other physicians. Dr. Buvanendran also testified that it was important to do periodic urine tests to determine if the patient is appropriately taking medication.

¶ 24    With regard to S.W., Dr. Buvanendran noted that because S.W. had been on probation for substance abuse, she was at extremely high risk for substance abuse. Dr. Buvanendran testified that there were no positive physical examination findings in April 2017 for S.W. and that he considered the subsequent prescription of 210 oxycodone tablets for shoulder and lumbar discomfort to be "very high." According to guidelines, there is documented evidence of high risk when prescribing above 90 MME to a patient, and Masood was prescribing 315 MME of oxycodone. Moreover, the oxycodone was coupled with benzodiazepines, which created a danger of increased potency. Dr. Buvanendran also explained that it would be customary for a physician to obtain a detailed history and do a complete physical examination of the patient before prescribing opiates to a patient, which Masood did not do. He also testified that Masood did not

document doing any kind of drug screen test or consulting the PMP in caring for S.W.

¶ 25    Dr. Buvanendran further testified that the frequency of some of the visits was "high[ly] significan[t]" and indicated that S.W. was seeking early refills, which meant that she had consumed a 30-day supply in a shorter timeframe. He explained that to continue prescribing controlled substances to a patient seeking an early refill, a physician should document the reason why the patient consumed the previously prescribed amount early, have a risk assessment discussion including checking the PMP, probably do urine toxicology, and reinforce the "narcotic agreement that the physician has with the patient." Dr. Buvanendran explained that a narcotic agreement is an "agreement or contract where a patient and physician agree on setting parameters when issuing opioids where the patient would follow the instructions of the prescriber in relation to the controlled substances." Based on Dr. Buvanendran's review of the medical records, it did not appear that Masood had a narcotic agreement with S.W. There was also nothing documented to indicate that Masood utilized any tool, such as checking the PMP or doing urine toxicology, to verify that S.W. was in compliance with the medication regimen.

¶ 26    Dr. Buvanendran testified that there were particular dangers of increased morbidity and mortality associated with the drug combinations that Masood prescribed to S.W. Dr. Buvanendran concluded that the clinical findings throughout Masood's treatment of S.W. did not clinically justify prescribing her 240 oxycodone tablets on top of Xanax, Soma, and Adderall. Dr. Buvanendran further concluded that Masood deviated from the standard of care and practice as it related to the prescription of controlled substances and that the controlled substances prescribed by Masood were "excessive."

¶ 27    With regard to M.S., Dr. Buvanendran testified that there were many red flags that should have alerted Masood not to prescribe more controlled substances to him and that Masood did not

review the PMP or do urine toxicology "at appropriate or periodic time points given the combination of the drugs prescribed." Dr. Buvanendran pointed to the fact that M.S. was coming from another state and M.S.'s pattern of reporting that prescriptions were lost or stolen. He noted in particular one instance where the medical records showed that M.S. gave different stories as to how his prescription had been either lost or destroyed. Dr. Buvanendran testified that this would "raise a significant concern for [Dr. Buvanendran] as a clinician." Dr. Buvanendran also pointed to instances in which the timing of M.S.'s reports would indicate that M.S. would have been without his medications for several days, and Dr. Buvanendran would expect in those circumstances that M.S. would have withdrawal symptoms based on his history and level of prescriptions. The records, however, did not indicate symptoms of withdrawal, nor did they document any effort by Masood to determine how M.S. was "getting by" without those controlled substances. Dr. Buvanendran would expect that when a patient reports that a medication or a prescription is lost or stolen, a physician should do a drug screen, urine toxicology, and engage in a risk assessment evaluation, none of which were documented by Masood. Dr. Buvanendran also testified that the March 2017 discharge letter suggested that there had been previous conversations with M.S. about possible illegal activity and yet Masood continued to prescribe him medications.

¶ 28    Dr. Buvanendran concluded, as to M.S., that Masood deviated from the expected standard of care in that there were multiple red flags that should have alerted Masood that the amount of controlled substances prescribed was inappropriate.

¶ 29    On cross-examination, Masood's counsel asked Dr. Buvanendran about whether he personally prescribes controlled substances to his patients and whether the facility where he works performs drug screens. Dr. Buvanendran replied yes to both questions. The Department objected to the latter question, arguing that Dr. Buvanendran's personal practice was irrelevant to his expert

testimony. The ALJ allowed the question and answer to stand. Counsel for Masood then asked whether Dr. Buvanendran "ever ha[d] a patient tell [him] that they can't afford something." The Department objected again, and the ALJ sustained the objection. Counsel for Masood then made an offer of proof of the remaining questions that he wanted to ask about Dr. Buvanendran's personal practice, specifically, (1) whether he had ever had a patient tell him that he or she does not have insurance, (2) whether he had ever had a patient not follow instructions for pain management, and (3) whether he had ever had a patient come to him with limited resources.

¶ 30    In his defense, Masood called Dr. Lawrence Robbins, who was qualified and testified as an expert in pain management and psychopharmacology. Dr. Robbins testified that the CDC guidelines were "suggestions and not mandated" and criticized the CDC for not "mak[ing] it clear that [the guidelines] applied to new patients and patients just going on opioids and not patients on higher doses to begin with." Dr. Robbins testified that S.W. "came in on a certain dose and he was grandfathered in to prescribe these medicines." Dr. Robbins acknowledged that S.W. was on a "fairly high dose" of both oxycodone and Xanax but testified that there was a "therapeutic reason" for prescribing those medications, as S.W. had documented chronic pain and anxiety. When asked whether he believed that Masood was "within the standard of care with respect to his treatment of S.W.," Dr. Robbins answered that he "d[id]n't think there is an accepted standard of care of chronic pain patients. There are suggestions but his treatment was very good."

¶ 31    Regarding M.S., Dr. Robbins testified that if a patient's family member calls and makes a complaint about abuse and misuse of medicines that the doctor is prescribing, a doctor should take that report "very seriously." Dr. Robbins thought Masood handled the situation "appropriately" by sending a dismissal letter based on the phone call. When asked whether it was appropriate for Masood to continue treating M.S. after the dismissal letter, Dr. Robbins responded that it "depends

on the situation" and there may have been "extenuating circumstances[.] [S]ometimes you trust the patient that they won't engage in be aberrant behaviors that are significant going forward, so it really depends." Dr. Robbins was asked several times about whether Masood increased S.W.'s dosage at the second visit based on records reflecting that he prescribed 210 tablets at 30 milligrams of oxycodone at the first visit and 240 tablets at 30 milligrams at the second visit. Dr. Robbins repeatedly gave nonresponsive answers, denied that the dosage was increased, or speculated that S.W. had been prescribed the higher dose by the pain clinic prior to seeing Masood.

¶ 32    Dr. Robbins testified that Masood was checking the PMP, but he acknowledged that his belief was not based on anything documented in the medical records but was because he "believe[d] [Masood]." Dr. Robbins was asked whether, accordingly to the guidelines, "prescription data monitoring program is important in monitoring compliance with the treatment agreement," and he responded that was "absolutely incorrect," but when presented with a copy of the guidelines he agreed, "That's what it says."

¶ 33    Following the hearing, the ALJ issued an 89-page report and recommendation. The ALJ found that the Department proved counts III and IV, regarding his treatment of patients S.W. and M.S., by clear and convincing evidence. The ALJ found that by prescribing excessive quantities of controlled substances to these two patients, Masood breached the accepted standard of care, engaged in dishonorable and unethical conduct, and prescribed medication for uses other than those medically accepted.

¶ 34    The ALJ found that Masood prescribed excessive amounts of controlled substances when treating S.W. The ALJ noted Masood's testimony that he was unaware of S.W.'s probation but found that testimony incredible. The ALJ further noted that on several occasions, the medical records reflected no discomfort or other pain, which the ALJ found strongly supported a conclusion

that the medications administered were excessive.

¶ 35    The ALJ concluded that Masood was not prescribing medication for a medically accepted therapeutic purpose but rather with the intent to provide S.W. with sufficient controlled substances to maintain her "physical or psychological addiction to, habitual or customary use of, or dependence on" those controlled substances. The ALJ further found that the controlled substances were prescribed to S.W. "without *** necessary care or monitoring," noting Dr. Buvanendran's testimony that Masood deviated from the standard of care by not starting S.W. on the lowest quantity of opioids required and not performing a risk assessment before increasing the dosage—all particularly harmful given S.W.'s history of substance abuse.

¶ 36    Turning to the count involving patient M.S., the ALJ found that Masood inappropriately prescribed controlled substances and breached his physician's responsibility in treating M.S. over the course of a decade. The ALJ agreed with Dr. Buvanendran's assessment that Masood missed many "red flags" regarding M.S., including that he traveled "hundreds of miles" from Ohio to see Masood, M.S.'s repeated "losses" of medication, and warnings from M.S.'s family. The ALJ found Masood's testimony that he believed M.S.'s excuses about his prescriptions being stolen to be incredible. Instead, the ALJ found that M.S. was clearly seeking drugs from Masood and that Masood was aware of "M.S.'s drug seeking" yet continued to supply him with controlled substances. The ALJ also concluded, as to M.S., that Masood was not prescribing medication for a medically accepted therapeutic purpose but rather with the intent to provide him with sufficient controlled substances to maintain his "physical or psychological addiction to, habitual or customary use of, or dependence on" those controlled substances.

¶ 37    The ALJ concluded, however, that the Department had not proven the first count, based on the DEA's reports that Masood prescribed a very large total sum of controlled substances over a

two-year period, because Masood's patient monitoring program data had not been introduced into evidence. The ALJ also found that the Department had not proven its allegation regarding Masood's lack of compliance with the Department's subpoena.

¶ 38    Based on the two proven counts against Masood, the ALJ recommended that Masood's licenses be suspended indefinitely for at least two years. The ALJ noted that Masood's offenses were very serious and dangerous to his patients. In addition to harming those individuals, the ALJ noted that the improper prescribing of opioids harms the general public, reduces the public's trust in physicians, and contributes to the normalization of improperly using controlled substances. The ALJ found that Masood's lack of contrition for his actions was an aggravating factor in the recommended sentence, and Masood "demonstrated no appreciation for the profound risks he took with his patients' lives and health." In mitigation, the ALJ noted that Masood stated that he was not currently practicing pain management and that he did not intend to do so in the future.

¶ 39    The ALJ concluded that

> "it [wa]s in the interest of [Masood] and the general public that [Masood] understands that ignoring warnings of a patient's misuse of controlled substances and inappropriately prescribing controlled substances is a very serious matter that risks harming the public and the practice of medicine. Furthermore, the [ALJ] conclude[d] that it is in the interest of [Masood] and the general public that [Masood] understands that prescribing controlled substances for reasons other than medically accepted therapeutic purposes so that [Masood]'s patients may misuse controlled substances is a profoundly serious matter that risks harming the public and the practice of medicine. To make certain that [Masood] understands the severity of his conduct and its potentially harmful results, and to provide [Masood]

14

with time to consider the matter, the [ALJ] recommend[ed] that [Masood]'s physician license be suspended indefinitely for a minimum of two years, and that [Masood]'s controlled substance license also be suspended indefinitely for a minimum of two years."

¶ 40    Thereafter, the Medical Disciplinary Board (Board) reviewed the record and adopted the ALJ's findings of fact, conclusions of law, and recommended discipline. The Director of the Division of Professional Regulation then entered an order on November 9, 2021, finding the recommended discipline appropriate.

¶ 41    The Director concluded that,

"[a]t best, [Masood] appears to be unable to conduct proper due diligence when it comes to treating these patients and prescribing them controlled substances. The totality of reasons patient M.S. derived in order to obtain controlled substances would strain credulity for even those who are not qualified to serve as an expert witness. [Masood]'s failure to check the PMP for patient S.W. or consider the disciplinary action on her license that even a cursory human resources investigation would detect *** reflects naivete at best."

¶ 42    The Director then emphasized that Masood's

"violations are serious in nature. Both patients' histories contained serious red flags that went unnoticed or ignored. In the instant matter, both of these patients were encouraged by [Masood]'s actions or inaction to keep pursuing controlled substances from him. *** On a larger level, [Masood's] approach to prescribing controlled substances ha[s] the potential to harm other patients under [his] care and contribute[s] to the opioid epidemic."

The Director further recognized that this was not an isolated incident, but rather an approach to two patients that was "almost mechanical in frequency and amount and occurred over a number of years." The Director noted that Masood showed no contrition for his offenses and found that his "conduct is not reflective of a medical professional who warrants the public trust." Accordingly, the Director ordered both Masood's physician and surgeon license and controlled substance license "indefinitely suspended for a minimum period of two (2) years."

¶ 43    The next day, on November 10, 2021, Masood filed a complaint for administrative review in the circuit court. Among other things, Masood alleged that the ALJ's findings of fact "presented an incomplete record of the evidence and testimony presented at the hearing" and that the hearing procedure was improper in that no Board members were present. Masood also alleged that the ALJ improperly allowed certain testimony, "impermissibly limited cross-examination," and improperly admitted certain exhibits. Masood also alleged that the ALJ improperly weighed evidence regarding his care for patients S.W. and M.S. and that the discipline imposed was overly harsh.

¶ 44    Two days later, on November 12, 2021, Masood sought an emergency stay of enforcement of the administrative agency's decision pending administrative review. The circuit court denied Masood's motion for an emergency stay, and Masood filed an interlocutory appeal from that order. In an earlier appeal in this case, this court affirmed the denial, as Masood failed to provide a sufficient record for this court to review his challenge. *Masood v. Division of Professional Regulation of the Illinois Department of Financial & Professional Regulation*, 2022 IL App (1st) 211530-U, ¶ 30.

¶ 45    Thereafter, the case proceeded in the circuit court. Following briefing and oral arguments by the parties on the complaint for administrative review, the circuit court entered a written order on April 21, 2022, denying administrative review. The circuit court determined that none of the

Department's findings were against the manifest weight of the evidence. Additionally, while the indefinite suspension of Masood's licenses for a minimum of two years was "substantial," it was not an abuse of discretion, as it was supported by "numerous aggravating factors," including the seriousness of the offenses, the presence of multiple violations, the impact on victims, and Masood's testimony indicating that he did not believe his conduct was wrongful. The court also found no errors in the ALJ's evidentiary rulings, or with the Board members not being present, given that it stated that "a majority of the Board concurred in [the decision] after reviewing the record."

¶ 46    Masood filed a timely notice of appeal from that order. In this court, Masood raises several challenges to the Director's decision. Specifically, Masood contends that the findings that he violated the Controlled Substances Act and Medical Practice Act were against the manifest weight of the evidence. Masood also alleges that the ALJ erred in disallowing certain intended cross-examination of Dr. Buvanendran and in allowing Dr. Buvanendran to testify to "undisclosed opinions." Next, Masood claims that the Director's order "must be reversed" because the Department failed to follow "mandatory procedures," in that no member of the Board was present during the disciplinary hearing and because only one member signed the Board's recommendation. Finally, Masood contends that the discipline imposed was inappropriate.

¶ 47    Final administrative decisions made by the Department pursuant to the Medical Practice Act are subject to judicial review under the provisions of the Administrative Review Law. 225 ILCS 60/41 (West 2020); 735 ILCS 5/3-101 *et seq.* (West 2020). In reviewing a final administrative decision, we review the Director's decision and not the ALJ's or the circuit court's determination. *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL App (1st) 123319, ¶ 19. The standard of review depends on the

question presented; this court reviews factual questions under the manifest weight of the evidence standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App (1st) 111968, ¶ 17; *Kafin v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 111875, ¶ 31. An administrative agency's decision is considered clearly erroneous only "when the reviewing court is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). An administrative agency's factual determinations are against the manifest weight of the evidence only "if the opposite conclusion is clearly evident." *Parikh*, 2014 IL App (1st) 123319, ¶ 28.

¶ 48    It "is for the Director, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts." *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 561 (2004). "The Director may accept or reject as much or as little of a witness's testimony as he pleases." *Morgan v. Department of Financial & Professional Regulation*, 388 Ill. App. 3d 633, 658 (2009). It is not the function of this court to " 'reevaluate witness credibility or resolve conflicting evidence,' but rather to determine only 'whether the findings of fact are supported by the manifest weight of the evidence.' " *Id.* (quoting *Ulysse v. Lumpkin*, 335 Ill. App. 3d 886, 893 (2002)).

¶ 49    Masood contends that the Director's order must be reversed because the ALJ misapplied the legal standard required to demonstrate Masood's intent. Masood refers to the ALJ's conclusion that Masood was prescribing controlled substances to S.W. and M.S. with the "inten[t] to provide [them] with controlled substances sufficient to maintain [their] physical or psychological

addiction, habitual or customary use, [or] dependence" on those controlled substances in violation of section 312(h) of the Controlled Substances Act. 720 ILCS 570/312(h) (West 2020). Masood contends that, even if the evidence showed that he was aware of the "drug-seeking" intents of S.W. and M.S., there was no evidence that Masood's subjective intent was to maintain their addiction. Masood contends that the Director applied an "objective negligence" standard, rather than finding "subjective intent," and that pursuant to *Ruan v. United States*, 597 U.S. ___, ___, 142 S. Ct. 2370, 2381 (2022), a higher *mens rea* is required.

¶ 50    As an initial matter, the Attorney General, representing the appellees in this appeal, asserts that Masood's argument is raised for the first time on appeal and, as a result, the argument is forfeited and this court should not consider it. See *Keeling v. Board of Trustees of the Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45 ("A party forfeits administrative review of issues and defenses not placed before the administrative agency."). It is well settled that a party on administrative review forfeits any argument not presented to the agency. See *Demesa v. Adams*, 2013 IL App (1st) 122608, ¶ 52.

¶ 51    Masood claims that the argument is not forfeited because he argued in his motion for rehearing "that the Department did not demonstrate Counts III and IV by clear and convincing evidence." In Masood's motion for rehearing, he claimed that the Department "did not meet its burden of proof." Masood's argument on this point, however, was essentially that the ALJ should have weighed the evidence differently, believing Masood's and his expert's denials and explanations, and disbelieving the testimony of Dr. Buvanendran. Masood never raised the argument he now seeks review of in this court—that the Department utilized an incorrect legal standard in assessing his intent. Accordingly, that argument is forfeited.[1]

---

[1]Masood also contends that the issue was not forfeited because he alleged that the Department "failed to prove a specific underlying violation of the Illinois Controlled Substances Act" in his complaint

¶ 52    Forfeiture aside, we are unpersuaded by Masood's challenge. Masood relies on *Ruan*, 597 U.S. at ___, 142 S. Ct. at 2381, a case interpreting the "*mens rea* required to convict" under a federal criminal statute. The United States Supreme Court in that case considered two consolidated cases in which doctors were criminally convicted for dispensing controlled substances. The Supreme Court determined that both courts of appeals had incorrectly understood the applicable scienter requirement when they allowed the convictions based on the issuing of a prescription that " 'was objectively not in the usual course of professional practice' " (*id.* at ___, 142 S. Ct. at 2376) or based on actions that " 'were outside the usual course of professional medical practice' " (*id.* at ___, 142 S. Ct. at 2375). The Supreme Court concluded that the prosecution "must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at ___, 142 S. Ct. at 2382. While the Supreme Court noted the subjective nature of the requisite intent, it explained that intent could, "of course," be proven through circumstantial evidence, and "the more unreasonable a defendant's asserted beliefs or misunderstandings are, especially as measured against objective criteria, the more likely the jury…will find that the Government has carried its burden" as to the intent requirement. (Internal quotation marks omitted.) *Id.* at ___, 142 S. Ct. at 2382.

¶ 53    Initially, we question *Ruan*'s applicability in this context, as Masood was not criminally prosecuted but was rather the subject of professional discipline. As the Controlled Substances Act makes clear, an individual's registration to distribute controlled substances may be revoked for a violation, regardless of whether it results in a criminal conviction. See 720 ILCS 570/304(a)(5) (West 2020). And many of the concerns underlying *Ruan* are not applicable to a disciplinary

for administrative review. Masood's general challenge again did not advance the specific complaint he raises here, and nonetheless, the arguments made in his complaint for administrative review are not relevant to whether the issue was before the administrative agency. See *Keeling*, 2017 IL App (1st) 170804, ¶ 45.

proceeding motivated by a need to protect the public and uphold professional standards of conduct. Compare *Ruan*, 597 U.S. at ___, 142 S. Ct. at 2376-77 ("[O]ur criminal law seeks to punish the vicious will. *** Consequently, when we interpret criminal statutes, we normally start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state." (Internal quotation marks omitted)), with *Carter-Shields v. Alton Health Institute*, 201 Ill. 2d 441, 458 (2002) ("The Medical Practice Act regulat[es] medical professionals in order to protect the public welfare ***." (Internal quotation marks omitted.)).

¶ 54     Nonetheless, even assuming that a subjective intent is necessary under the statute, we would find no reason to overturn the Director's conclusion on this issue. The nature of a person's intent is a factual question (*People v. Testa*, 261 Ill. App. 3d 1025, 1031 (1994)), which this court reviews under the manifest weight of the evidence standard (*Parikh*, 2014 IL App (1st) 123319, ¶ 28). As stated above, an administrative agency's factual determinations are against the manifest weight of the evidence only "if the opposite conclusion is clearly evident." *Id.* Although Masood denies having the requisite intent, "a mental state is seldom subject to direct proof and must generally be inferred from circumstances which warrant the inference." *People v. Kline*, 41 Ill. App. 3d 261, 266 (1976).

¶ 55     Here, the evidence before the Director showed that Masood ignored red flags to continue prescribing unreasonably high dosages of controlled substances, despite S.W. and M.S.'s obvious drug-seeking behaviors. With regard to S.W., Dr. Buvanendran testified that the dosages that Masood prescribed were excessive and not clinically justified. The ALJ also relied on the fact that S.W. had documented substance abuse issues and that Masood increased her dosage during the course of the eight months he saw her, despite there being no documented clinical reason to do so.

Likewise, as to M.S., who drove from Toledo, Ohio, to Joliet, Illinois, to see Masood, the Director found that Masood continued to provide him controlled substances over excuses that "strain[ed] credulity." Additionally, Masood continued M.S.'s prescriptions, even after warnings from M.S.'s family members about his substance abuse issues and illegal activities. In these circumstances, we do not find "the opposite conclusion"—*i.e.*, that Masood did *not* prescribe controlled substances with the "inten[t] to provide [S.W. and M.S.] with controlled substances sufficient to maintain [their] physical or psychological addiction, habitual or customary use, [or] dependence" (720 ILCS 570/312(h) (West 2020))—"clearly evident." See *Parikh*, 2014 IL App (1st) 123319, ¶ 28.

¶ 56    Masood next claims that the Department failed to prove that Masood violated the Medical Practice Act. Specifically, the ALJ and Director found that the Department demonstrated, by clear and convincing evidence, that Masood violated section 22(A)(5), (17), and (33) of the Medical Practice Act (225 ILCS 60/22(A)(5), (17), (33) (West 2020)) in his treatment of patients S.W. and M.S. These subsections permit the Department to impose discipline on a medical licensee for, respectively, "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public," "[p]rescribing *** any drug classified as a controlled substance *** for other than medically accepted therapeutic purposes," and "[v]iolating state or federal laws or regulations relating to controlled substances." *Id.*

¶ 57    The purpose of the Medical Practice Act is to regulate medical professionals in Illinois to protect the public welfare. *Carter-Shields*, 201 Ill. 2d at 458. And "[t]he practice of medicine, in addition to skill and knowledge, requires honesty and integrity of the highest degree." *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 400 (1998). The Medical Practice Act embodies the state's "legitimate concern for maintaining high standards of professional conduct [which] extends beyond the initial licensing." *Id.*

¶ 58    First, Masood contends that the Department failed to demonstrate a violation of the Controlled Substances Act, and therefore, it "follows" that the Department failed to demonstrate a violation of section 22(A)(33) of the Medical Practice Act, which permits the Department to discipline a licensee for violating state and federal laws related to controlled substances. As we previously rejected Masood's argument regarding the Controlled Substances Act, we need not further address this claim.

¶ 59    The bulk of Masood's remaining challenges attack the weight assigned to evidence and the assessment of witness credibility. Although Masood generally takes issue with the ALJ's findings, we reiterate that this court reviews the Director's decision, and not the ALJ's determination (*Parikh*, 2014 IL App (1st) 123319, ¶ 19), and that it is not the function of this court to reweigh the evidence, reevaluate witness credibility, or make an independent determination of the facts (*Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 121226, ¶ 31). Rather, a reviewing court determines only " 'whether the findings of fact are supported by the manifest weight of the evidence.' " *Morgan*, 388 Ill. App. 3d at 658 (quoting *Ulysse*, 335 Ill. App. 3d at 893).

¶ 60    Masood claims that the ALJ chose to disregard Masood's testimony that he did not know about S.W.'s prior substance abuse history and probation. Although Masood denied knowing that S.W. was on probation by the Department, the record before the Director showed that S.W. was a nurse at Masood's practice and that the consent order disciplining her license was a public record. Dr. Buvanendran testified that he would, and did, have knowledge of the disciplinary history of all nurses in his practice and that he would be aware of that information before a nurse was hired. Based on the evidence, the Director found that Masood's failure to "consider the disciplinary action on her license that even a cursory human resources investigation would detect *** reflects

23

naivete at best." In these circumstances, we find no basis to overturn the Director's assessment of credibility or rejection of Masood's denial.

¶ 61    Masood also claims that the ALJ did not give enough weight to Dr. Robbins's testimony. This court, however, defers to the agency's assessment of the testimony and the credibility of the witnesses (*Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 542 (2010)), and the ALJ made extensive findings as to Dr. Robbins's credibility, noting that he had a "nervous demeanor," was "evasive," and engaged in "rote denial." The ALJ also noted that Dr. Robbins testified inconsistently with the medical records, calling his familiarity with Masood's practices into question. The ALJ further found that Dr. Robbins "engag[ed] in needless parsing of questions" to "avoid[ ] answering" them, ultimately finding him to be "not a credible witness." We find no basis to overturn that assessment.

¶ 62    Masood next points to one particular statement made by Dr. Buvanendran, acknowledging that Masood was treating M.S. for chronic pain, which is a medically accepted purpose. Specifically, on cross-examination, the following exchange occurred:

> "[MASOOD'S COUNSEL]: For M.S., you would agree that Dr. Masood is trying to—therapeutically trying to treat this patient?
>
> [DR. BUVANENDRAN]: The patient has chronic pain.
>
> * * *
>
> [MASOOD'S COUNSEL]: *** I am asking you about Dr. Masood's care. You would agree that he is trying to therapeutically treat the patients?
>
> [DR. BUVANENDRAN]: Well, I would have to answer that question by—
>
> [MASOOD'S COUNSEL]: Yes or no?
>
> [DR. BUVANENDRAN]: Well, I have to qualify that.

24

[MASOOD'S COUNSEL]: I can ask you a follow up, but I want a yes or no first.

[DR. BUVANENDRAN]: Correct, yes."

¶ 63    Based on this statement, Masood contends that it is against the manifest weight of the evidence to conclude that he violated the Medical Practice Act in relation to M.S. because even Dr. Buvanendran "believed" that Masood was "therapeutically treating Patient M.S." Masood's argument takes a single "yes" and reads it completely out of context considering Dr. Buvanendran's entire testimony. Although Dr. Buvanendran acknowledged that M.S. had chronic pain, he testified extensively about the red flags that should have alerted Masood to M.S.'s drug-seeking. Based on the evidence, we find no basis to disturb the Director's determination that Masood violated the Medical Practice Act in the course of treating S.W. and M.S.

¶ 64    Masood next contends that the ALJ made improper evidentiary rulings as to Dr. Buvanendran. Masood asserts that his challenge is a "pure question of the applicability of law and legally required scope of cross examination" and accordingly, "it must be reviewed under the *de novo* standard." In support, he cites a case for the general proposition that questions of law are reviewed *de novo.* He provides no support, however, for his assertion that the ALJ's evidentiary rulings constitute questions of law.

¶ 65    To the contrary, this court reviews an administrative agency's decision regarding the admission of evidence for an abuse of discretion. *Danigeles v. Illinois Department of Financial & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 89. This court has held that an "administrative decision will not be overturned because the administrative judge failed to observe the rules of evidence unless the error 'materially affected the rights of any party and resulted in

substantial injustice to [the party].' " *Kafin*, 2012 IL App (1st) 111875, ¶ 38 (quoting 735 ILCS 5/3-111(b) (West 2008)).

¶ 66    Masood's complaint stems from the ALJ's decision not to allow Masood's counsel to ask certain questions about Dr. Buvanendran's personal practice. Specifically, Masood's counsel elicited testimony that Dr. Buvanendran prescribes controlled substances to his patients and that the facility where he works performs drug screens. The ALJ, however, found that further testimony as to Dr. Buvanendran's personal practice was not relevant, and counsel was not permitted to ask whether Dr. Buvanendran had ever had a patient who had limited resources, who did not have insurance, who could not "afford something," or who did not follow instructions for pain management.

¶ 67    Masood first argues that he should have been allowed to elicit testimony from Dr. Buvanendran about his personal practice, relying on a medical malpractice case, *Schmitz v. Binette*, 368 Ill. App. 3d 447 (2006). In *Schmitz*, a medical expert testified that the standard of care did not require a doctor to perform a particular test and that the test was unreasonably dangerous and ineffective. However, during the expert's earlier deposition, he had stated that he personally performed the test " 'quite readily, quite commonly.' " *Id.* at 461. This court held that the jury was entitled to hear the inconsistent testimony, which may have provided additional insight to the jury regarding the testimony. *Id.*

¶ 68    We initially question the applicability of *Schmitz* here, as it was a medical malpractice case and not an administrative proceeding. See *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 79 ("the strict rules of evidence that apply in a judicial proceeding are not applicable to proceedings before an administrative agency"). Nonetheless, cases following *Schmitz* have clarified that personal practice testimony is only relevant to credibility if there is an indication

that it will be inconsistent with testimony relating to standard of care. See *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶¶ 28-29; *Swift v. Schleicher*, 2017 IL App (2d) 170218, ¶ 88.

¶ 69    Here, Masood points to no prior testimony by Dr. Buvanendran, or any other reason to believe that the evidence would show that Dr. Buvanendran's personal practice is inconsistent with his testimony relating to the standard of care. Moreover, this court does not see how Masood's counsel proposed questions, relating to whether he had treated patients without insurance and with limited resources, and whether any patients had not followed his instructions, would elicit any testimony that would be inconsistent with the standard of care to which he testified.

¶ 70    Additionally, regardless of the propriety of the ALJ's ruling, an incorrect evidentiary ruling can only be the basis of reversal if the error resulted in substantial injustice. See *Danigeles*, 2015 IL App (1st) 142622, ¶ 82 ("An evidentiary ruling, even if incorrect, will not be reversed unless there is 'demonstrable prejudice to the complaining party.' "); *Village of Stickney v. Board of Trustees of the Police Pension Fund*, 347 Ill. App. 3d 845, 852-53 (2004) (holding that the Board's decision to exclude cross-examination conducted by party was not reversible error because the party did not show that it was prejudiced by that ruling).

¶ 71    Masood contends that he established prejudice because he was precluded from "challenging Dr. Buvanendran's knowledge and experience, which go directly to the weight given his testimony" and that "[a]s an anesthesiologist practicing at Rush University, [the intended] testimony would have established that Dr. Buvanendran did not possess the specialized knowledge or experience in treating pain management patients as a primary care physician in Joliet." Masood further contends that his counsel's questions would "have demonstrated that Dr. Buvanendran was unaware of the daily practices of primary care physicians, particularly those in underserved areas who were required to treat pain management patients." Masood assumes, with no evidence to

support such contentions, that Dr. Buvanendran does not care for patients with limited resources and that the standard of care for physicians is different based on the income of the patients they serve. Moreover, although he contends that the evidentiary rulings prevented him from adequately challenging Dr. Buvanendran's credibility, Masood's counsel argued in closing that Dr. Buvanendran was "an ivy-tower physician, [who] has no feel for what it's like to practice in the Joliet area, with the type of practice Dr. Masood has." It is clear, however, that the ALJ and Department were not persuaded by Masood's attacks on Dr. Buvanendran's credibility on this basis, and there is no reason to believe that answers to Masood's counsel's proffered questions would have had any effect on that credibility assessment, or the outcome of the proceeding.

¶ 72      Masood next claims that the ALJ improperly allowed Dr. Buvanendran to testify to opinions that were not disclosed during discovery, which he claims violates his due process rights and section 1110.130(b) of Title 68 of the Illinois Administrative Code (68 Ill. Adm. Code 1110.130(b) (2019)). Specifically, Masood alleges that Dr. Buvanendran was improperly "permitted to provide expert testimony and opinions regarding Dr. Masood's practice and his care for Patients S.W. and M.S. over Dr. Masood's objection, where Dr. Masood was not previously provided an expert report or otherwise provided with a description of the testimony and evidence that was to be offered."

¶ 73      In support, he cites the administrative regulation that, as relevant here, requires parties to disclose, upon written request, (1) the name and address of witnesses, including experts, who may testify, (2) copies of documentary evidence, and (3) a "description of any other evidence that may be offered." *Id.* Masood relies on paragraph (3), which requires "[a] description of any *other* evidence" (emphasis added) (*id.*), to allege that the Department was required to provide a description of Dr. Buvanendran's testimony. A fair reading of the section, however, makes clear

28

that the phrase "description of any other evidence" does not apply to the testimony of witnesses, including expert witnesses, as they are enumerated earlier in the section.[2]

¶ 74    Additionally, even if the Department had been required to provide a description of Dr. Buvanendran's anticipated testimony, which we do not find, the question for purposes of a due process challenge is whether such failure rendered the proceedings fundamentally unfair. See *Lyon v. Department of Children & Family Services*, 335 Ill. App. 3d 376, 385 (2002) ("we find no basis in the record for holding that the proceedings were fundamentally unfair, at least with respect to discovery").

¶ 75    "Where an administrative proceeding gives the petitioner a fair opportunity to be heard, including the opportunity to cross-examine witnesses and present evidence, generally this is considered sufficient to insure due process and a fair, impartial hearing." *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 48 (2000). In this case, Masood received the essential elements of a fair hearing before an administrative agency, and we find no basis to conclude that the proceedings were fundamentally unfair.

¶ 76    Masood also argues that his due process rights were violated because no Board member attended the hearing and because only one Board member signed the Board's recommendation. Masood relies on *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76 (1992), to assert that the Medical Practice Act requires at least one Board member be present to listen to live testimony. Masood, however, misunderstands the holding of *Abrahamson*. While the court in *Abrahamson* determined that the presence of one Board member was *sufficient* to afford due process, it did not conclude that it was *necessary*. To the contrary, the court in *Abrahamson*

---

[2]Interestingly, in the administrative proceedings, Masood did not appear to interpret the rule as requiring a description of expert testimony, as Masood himself did not produce any expert reports or further information beyond the name of his expert witness.

stated that "agency members making the final decision need not be present when the evidence is taken, so long as they review the record of proceedings." *Id.* at 95. Additionally, cases following *Abrahamson* have explicitly clarified that no Board members are required to be present at the hearing, so long as they review the record of proceedings before rendering their recommendation. *Kafin,* 2012 IL App (1st) 111875, ¶ 33. We disagree with Masood's contention that *Kafin* is incompatible with *Abrahamson* and decline his invitation to find that it was wrongly decided.

¶ 77    Masood also argues that the requirement that the Board review the transcript was not satisfied here, taking issue with the Board's statement that it reviewed "the record," rather than specifically stating that it reviewed the "transcript." An agency is "presumed to act lawfully" (*Chicago Alliance for Neighborhood Safety v. City of Chicago*, 348 Ill. App. 3d 188, 210 (2004)) and is "entitled to the presumption that it properly read and considered the evidence" (*Glaser v. City of Chicago*, 2018 IL App (1st) 171987, ¶ 27). Masood has provided nothing to support an inference that the record reviewed by the Board did not include a transcript of the proceedings, or to rebut the above presumptions.

¶ 78    Masood also argues that because only the Board chairperson signed the recommendation, it was not made by a majority of the Board members. Masood, however, cites no requirement that all Board members must sign the recommendation. Moreover, in the Director's order, she noted that at the time of the Board's meeting, the governor of Illinois had issued a disaster declaration related to public health concerns and, pursuant to an executive order, the requirement for in-person attendance by members of a public body under the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2020)) was suspended. As such, the chairperson signed the Board's report on behalf of the Board, which was operating remotely. Additionally, even if a single signature from the Board chairperson is not sufficient, Masood has provided no argument as to how the failure to obtain signatures from

the rest of the board members rendered the proceedings fundamentally unfair, particularly where he acknowledges that the recommendation itself indicates that it was made by a majority of its members.

¶ 79    Finally, Masood raises several challenges the propriety of the sanction imposed by the Director. First, he asserts that the indefinite nature of the discipline imposed was "not legally permitted," as the Medical Practice Act provides that the Department "may revoke, suspend, place on probation, reprimand, refuse to issue or renew" a license (225 ILCS 60/22(A) (West 2020)), and the Controlled Substances Act provides that a controlled substances license "may be denied, refused renewal, suspended, or revoked" by the Department (720 ILCS 570/304(a) (West 2020)). Masood contends that the Medical Practice Act refers to a "term" of suspension (see 225 ILCS 60/43 (West 2020) (noting that the Department may restore a license "after the successful completion of a *term* of *** suspension" (emphasis added))) and the word "indefinite" does not appear.

¶ 80    Here, the Department "indefinitely suspended" Masood's licenses "for a minimum period of two (2) years." Accordingly, the discipline imposed contained a term of two years, at which time Masood can seek restoration of his license. Contrary to Masood's argument that suspensions must be for a set term at which time a license would be automatically restored, the Medical Practice Act explicitly contemplates the indefinite nature of suspensions, setting forth the procedure for restoring a license following a term of suspension. *Id.* ("At any time after the successful completion of a term of *** suspension *** the Department may restore the license to the licensee, unless after an investigation and a hearing, the Secretary determines that restoration is not in the public interest.").

¶ 81     Masood next argues that the Director violated section 40(c) of the Medical Practice Act by not including the grounds on which the discipline was based and any "terms and conditions" of the discipline. See *id.* § 40(c) ("Each order of revocation, suspension, or other disciplinary action shall contain a brief, concise statement of the ground or grounds upon which the Department's action is based, as well as the specific terms and conditions of such action."). Masood's argument that the Director's decision did not contain the grounds for discipline is belied by the record, as the Director extensively discussed Masood's violations and why discipline was warranted in the eight-page decision. Additionally, Masood's licenses were suspended in their entirety, and it is not clear what "terms or conditions" of that suspension could have been imposed.

¶ 82     Masood also alleges that the Director abused her discretion in the discipline imposed because it "was not warranted by the underlying facts." Where, as here, we are reviewing the propriety of a particular sanction imposed by the Director, the standard of review is whether the Director abused his or her discretion in the imposition of the sanction. *Kafin*, 2012 IL App (1st) 111875, ¶ 42; *Reddy v. Department of Professional Regulation*, 336 Ill. App. 3d 350, 354 (2002). An abuse of discretion occurs only when no reasonable person could agree with the decision at issue. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. The Director abuses his or her discretion when a sanction is imposed that is (1) overly harsh, arbitrary or unreasonable in view of the mitigating circumstances or (2) unrelated to the purpose of the statute. *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 763 (1999); *Kafin*, 2012 IL App (1st) 111875, ¶¶ 42-43. On review, "[w]e must defer to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest." *Reddy*, 336 Ill. App. 3d at 354. Although "the hearing officer may consider sanctions imposed in similar cases," "each case

32

must be considered on its merits [citation], and it is for the Department to determine the appropriate sanction in each case." *Siddiqui*, 307 Ill. App. 3d at 764.

¶ 83    Deferring to the Director's expertise and experience, as we must, our review of the record reveals that the Director properly exercised her discretion when she imposed an indefinite suspension for a minimum of two years. Among other factors, the Director relied on the serious nature of Masood's violations, the harm to those patients and the public, the length of time and frequency with which the violations occurred, the discipline imposed by the DEA, and Masood's lack of contrition in determining the appropriate discipline.

¶ 84    Masood, however, argues that his failure to accept responsibility was improperly considered as an aggravating factor. He relies on *In re Wigoda*, 77 Ill. 2d 154 (1979), claiming it suggests that "the Department is not permitted to use Dr. Masood's disagreement with the Department's allegations to justify a harsher punishment." *Wigoda*, however, addressed the issue of reinstatement of a license rather than discipline, explaining that the "[r]espondent's assertion of innocence[ ] and *** his lack of repentance, *are factors to be considered* in considering a petition for reinstatement," but that those factors were, alone, not sufficient to bar the reinstatement of his license. (Emphasis added.) *Id.* at 159. Masood contends that under *Wigoda*, "a physician admitting his mistake is a positive character trait that the Department can take into consideration, but the fact that the physician does not believe he committed any alleged violations based upon his belief is not an appropriate consideration to hold against the physician in imposing discipline." Here, however, the relevant statute expressly provides that Masood's "lack of contrition for the offenses" is an aggravating factor that the Department "shall consider" in determining the appropriate discipline. 20 ILCS 2105/2105-130(b)(7) (West 2020).

¶ 85    Masood also argues that the discipline imposed violates a uniformity requirement in administrative decisions. Although the Illinois Supreme Court has held that a " 'degree of uniformity' " is required in other types of disciplinary proceedings, the court has also made clear that " 'each case must still be determined on its own merits.' " *In re Spencer*, 68 Ill. 2d 496, 501 (1977). In the context of physician discipline, this court has clarified that although " 'the hearing officer may consider sanctions imposed in similar cases *** each case must be considered on its merits [citation], and it is for the Department to determine the appropriate sanction in each case.' " *Nwaokocha v. Illinois Department of Financial & Professional Regulation*, 2018 IL App (1st) 162614, ¶ 56; see also *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 50 (declining to consider whether a discharge was unreasonable because the agency failed to consider unrelated cases in making its determination).

¶ 86    In support of his argument, Masood cites an exhibit he attached to his motion for rehearing of the ALJ's decision. That exhibit was entitled "Compilation of Public Disciplinary Precedent" and included very brief, generally one-sentence-long, descriptions of other disciplinary actions, the violations, and the discipline imposed. In this court, Masood contends that those disciplinary actions show that the Department imposed lesser sanctions in similar "or *** more egregious" cases.

¶ 87    Masood, however, has not provided a sufficient record with which this court could compare this action with any other disciplinary proceeding. Masood's descriptions also only refer to the violations as involving "inappropriate" prescribing of controlled substances, without any further information as to the severity of the violations or the length of time over which they occurred. As the record contains only Masood's characterization of the violations and discipline imposed, but nothing to provide additional information about the underlying facts or to verify the accuracy of

Masood's descriptions, Masood has failed to show any other proceedings that require a different result in his case. See *Siddiqui*, 307 Ill. App. 3d at 764 (finding that the sanctions imposed in other proceedings did not warrant a different result where the plaintiff physician "merely cite[d] the outcome in these cases with no discussion of the facts supporting the sanctions").

¶ 88     Masood also contends that the ALJ had an improper punitive motive, based on the ALJ's remark that the discipline would allow time for Masood to "understand[ ] the severity of his conduct." He contends that the purpose of sanctions authorized by the Medical Practice Act is not to punish, but rather "to protect the public health and welfare from those not qualified to practice medicine," citing *Reddy*, 336 Ill. App. 3d at 355.

¶ 89     We reiterate, again, that we review the decision of the Director, and not that of the ALJ. Nonetheless, and contrary to Masood's assertion, the ALJ's comment about giving Masood time to understand the severity of his violations before allowing him to practice medicine again was an appropriate response to Masood's lack of contrition and a proper comment driven by the need to protect the public health and welfare.

¶ 90     For the first time on appeal, Masood also argues that only his controlled substance license should have been suspended and not his physician and surgeon license because, according to him, the ALJ and Director did not identify "any concern regarding Dr. Masood's practice as a primary care physician outside of his pain management practice or controlled substance prescribing." This argument is forfeited as Masood failed to raise it in front of the Department. *Keeling*, 2017 IL App (1st) 170804, ¶ 45; see *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998) (holding that an appellate court properly refused to consider an issue for failure to raise it during the administrative proceedings). Nonetheless, the Medical Practice Act specifically authorizes the Department to suspend a license issued under the act for "[p]rescribing *** any drug classified as

35

a controlled substance *** for other than medically accepted therapeutic purposes" and for "[v]iolating state or federal laws or regulations relating to controlled substances." 225 ILCS 60/22(A)(17), (33) (West 2020). Accordingly, there is no requirement that the Department establish a violation unrelated to controlled substances to suspend a medical practice license, and we find no abuse of the discretion by the Director in choosing to suspend both licenses in this case.

¶ 91    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 92    Affirmed.

*Masood v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, **2023 IL App (1st) 220657**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CH-05718; the Hon. David B. Atkins, Judge, presiding. |
| **Attorneys for Appellant:** | Michael K. Goldberg, Dominic A. Velloze, and Jonathan Youseph, of Goldberg Law Group, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Anna W. Gottlieb, Assistant Attorney General, of counsel), for appellees. |