2023 IL App (1st) 220371-U

No. 1-22-0371

Order filed June 30, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| SEAN YETMAN, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 2020 CH 6287 |
| ILLINOIS DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION; and CECILIA | ) | |
| ABUNDIS, Acting Director of the Department's | ) | The Honorable |
| Division of Professional Regulation, | ) | Eve M. Reilly, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Illinois Department of Financial and Professional Regulation proved its case to suspend, then refuse to renew, appellant's medical license, by clear and convincing evidence. Additionally, appellant failed to show the evidentiary rulings at the administrative hearing were erroneous or an abuse of discretion. Finally, the sanction imposed was not an abuse of discretion and appellant's due process rights were not violated. We therefore affirm the circuit court's judgment confirming the Department's decision to refuse to renew appellant's medical license.

¶ 2      Dr. Sean Yetman appeals from the circuit court's order confirming the decision of the Illinois Department of Financial and Professional Regulation (Department), which suspended Dr. Yetman's medical license in Illinois and later placed his license in "refuse to renew" status based on alleged disciplinary action previously taken against Dr. Yetman in Wisconsin. Specifically, when the Wisconsin Board began to investigate allegations of misconduct brought against Dr. Yetman, Dr. Yetman agreed to surrender his Wisconsin medical license to avoid formal charges and a full investigation and hearing by the Wisconsin Board. Dr. Yetman argued to the Department and the court below that the Wisconsin Board's actions were not "disciplinary" in nature for purposes of the Illinois Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 60/1 *et seq.* (West 2012)) since the Wisconsin Board did not charge him with misconduct or investigate the matter further following the settlement. The circuit court subsequently affirmed the Department's decision to refuse to renew Dr. Yetman's Illinois license.

¶ 3      On appeal, Dr. Yetman argues, in the main, that the Department's decision concerning his license must be reversed because the discipline imposed was unduly harsh under the circumstances, the evidence presented established mitigating circumstances, and the temporary suspension of his Illinois medical license violated his due process rights and the Medical Practice Act. In addition, Dr. Yetman argues that the voluntary surrender of his Wisconsin medical license is not "discipline," within the meaning of the Medical Practice Act, and therefore, should not have been considered disciplinary in nature by the Department. For the following reasons, we affirm the circuit court's judgment.

¶ 4                                  I. BACKGROUND

¶ 5      In June 2001, Dr. Yetman received his medical degree from the College of Physicians and Surgeons at Columbia University in New York City. Over the next nine years, Dr. Yetman

completed his residency, along with fellowship programs in New York and Connecticut. He obtained his first medical license during that time from the State of New York.

¶ 6    In August 2010, Dr. Yetman was hired as a staff surgeon at Meriter Hospital, located in Madison, Wisconsin; however, he was not officially licensed to practice medicine in Wisconsin until the following May (license No. 55706-20).

¶ 7                    A. Wisconsin Disciplinary Proceedings

¶ 8    The following year, questions arose regarding Dr. Yetman's competency as a doctor after two of his patients died shortly after he performed cardiac surgery on them.

¶ 9    The first (more recent) patient (Patient A) was a 77-year-old man who was admitted to the hospital in August 2011, with congestive heart failure. He required mitral valve repair or replacement and aorto-coronary bypass surgery. Patient A was then operated on by Dr. Yetman, who was responsible "for all surgical decisions and technique[s]." During the surgery, Patient A experienced "considerable bleeding," and after the surgery, he "continued to bleed from all areas and died a short time later."

¶ 10    The second patient (Patient B) was a 61-year-old woman who was admitted to the hospital in late June 2011, for treatment of acute coronary syndrome. Testing revealed that she had significant coronary disease and moderate to severe mitral insufficiency. Like the first patient, Patient B also required mitral valve repair or replacement and bypass surgery. She was eventually operated on by Dr. Yetman, who was "responsible for all surgical decisions and technique[s]." Patient B had to return to the operating room five days after her surgery with Dr. Yetman for chest closure and removal of an intra-aortic balloon pump that had been placed inside her. She subsequently developed kidney and liver failure and acute respiratory distress

syndrome. Eventually, Patient B's family asked that she not be resuscitated and that she be taken off life support. Patient B died shortly thereafter.

¶ 11   Following those patients' deaths, Dr. Yetman left Meriter hospital. He did not practice medicine for five months while he was on "Vacation/Unemploy[ment]." During that time, Dr. Yetman looked for employment and also submitted a multi-state medical license application to be licensed in Illinois, Pennsylvania and Massachusetts.

¶ 12   In September 2012, Dr. Yetman accepted a position as a "Clinical Associate in Cardiac Surgery" and as an "Instructor in Surgery" at Beth Israel Deaconess Medical Center, located in Boston, Massachusetts. Dr. Yetman worked there until 2016, when he moved to New York with his family.

¶ 13   Dr. Yetman's Wisconsin medical license expired on October 31, 2013, while he was living and working in Massachusetts. Sometime thereafter, the Wisconsin licensing agency began investigating allegations against Dr. Yetman related to the deaths of Patients A and B (*In the Matter of Disciplinary Proceedings Against Sean M. Yetman, M.D.*, *Respondent*, case 13 MED 061.)

¶ 14   In February 2014, the agency's prosecuting attorney, Arthur Thexton, offered Dr. Yetman a settlement regarding the disciplinary charges against him. Dr. Yetman accepted the offer, and as part of the settlement, he signed a stipulation stating that he "denie[d] any unprofessional conduct, but solely to settle this matter and avoid the expenses and uncertainties of litigation," and agreed to the adoption of an order by the Wisconsin Medical Examining Board (Wisconsin Board). In addition, Dr. Yetman agreed to waive all "applicable rights" under state and federal law, including rights to a hearing on the disciplinary charges, to petition for rehearing and to appeal the final order. Finally, the stipulation provided that if it were adopted by the

Wisconsin Board, the final order would be made public and "published in accordance with standard Department procedure."

¶ 15    The next month, the Wisconsin Board issued an order stating,

> "[Dr. Yetman denies any unprofessional conduct with respect to the care of either Patient A or Patient B. However, because [Dr. Yetman] has left the State of Wisconsin and allowed his registration to lapse, in resolution of this matter, [Dr. Yetman] consents to the entry of the following Conclusion of Law and Order."

The Wisconsin order further stated the stipulation that Dr. Yetman surrender his Wisconsin medical license and his right to renew his registration was accepted by the Board and that if Dr. Yetman sought to be relicensed in the future, he would have to pay the costs of such proceedings.

¶ 16                              B. Illinois Proceedings

¶ 17    In June 2014, after learning of the Wisconsin Board's action against Dr. Yetman, the Department filed an administrative complaint against him. The Department also filed a petition for temporary suspension of Dr. Yetman's Illinois license (No. 036.131000) pending a formal hearing on the Department's administrative complaint. The Department's complaint alleged that discipline of Dr. Yetman's Illinois license was appropriate under sections 22(A)(12) and 22(A)(34) of the Medical Practice Act because he was disciplined by a sister state (*i.e.*, Wisconsin) and failed to report it.

¶ 18    The Department supported its allegations with the Wisconsin Board's order and an affidavit from Dr. Brian Zachariah, the Chief Medical Coordinator of the Department's Division of Professional Regulation. In his affidavit, Dr. Zachariah stated,

"[Dr. Yetman] is not eligible to practice in the State of Wisconsin because the Wisconsin Board issued a Final Decision and Order accepting [Dr. Yetman's] surrender of his license to practice medicine due to his alleged unprofessional conduct in the treatment of two cardiac surgery patients who died immediately or shortly after operations performed by [Dr. Yetman]."

In conclusion, Dr. Zachariah stated, "I am of the opinion within a reasonable degree of medical certainty that the continued practice of medicine by Sean M. Yetman, M.D. presents an immediate danger to the safety of the public in the State of Illinois."

¶ 19    On June 17, 2014, Jay Stewart, the Director of the Department's Division of Professional Regulation (Director), held an *ex parte* hearing on the Department's petition for temporary suspension of Dr. Yetman's license. At the hearing, Dr. Zachariah was asked why he believed Dr. Yetman's continued medical practice posed a risk to the people of the State of Illinois. In response, Dr. Zachariah testified,

"Well, Dr. Yetman is a cardiovascular surgeon, and he recently, at least as far as we know recently, operated on two patients with really significant disastrous outcomes. So much so that the state of Wisconsin felt that he was incapable of practicing medicine, and when confronted with that charge, he opted to surrender his license, and if he is so impaired, so lacking in the requisite judgment, skill and safety to practice in that state, I believe he is also incapable of practicing in our state as well."

Following the hearing, the Director concluded that "the public interest, safety and welfare imperatively require emergency action to prevent the continued practice of Sean M. Yetman, M.D., *** in that [his] actions constitute an immediate danger to public," and issued an order

suspending Dr. Yetman's medical license in Illinois pending administrative proceedings. Dr. Yetman was notified of the suspension that day.

¶ 20    The Department scheduled an initial hearing on the administrative complaint nine days later, but Dr. Yetman continued the matter several times. Meanwhile, Dr. Yetman's Illinois medical license expired, and he elected to not renew it at that time.

¶ 21                                    1. Motion to Dismiss

¶ 22    In September 2014, Dr. Yetman moved to dismiss the Department's complaint against him, arguing, in the main, that the Wisconsin Board's order was non-disciplinary, within the meaning of the Medical Practice Act, and therefore, did not meet the criteria for discipline under the relevant sections of the Act. Dr. Yetman attached to the motion copies of his resume and an unsigned letter from Mr. Thexton containing the Wisconsin settlement offer. That letter stated the Wisconsin Board's case advisor recommended that Dr. Yetman be disciplined but also noted that Mr. Thexton was "authorized to offer a settlement" that would allow Dr. Yetman to avoid "formal discipline."

¶ 23    In response, the Department argued that the Wisconsin Board's order satisfied the statutory requirements to impose discipline on Dr. Yetman's Illinois license and that the agreed stipulation entered into between him and the Wisconsin Board constituted "disciplinary action" for purposes of the Medical Practice Act.

¶ 24    Dr. Yetman replied that (1) the "surrender" of a medical license was not considered discipline under the Wisconsin statute, (2) the surrender was an action taken by Dr. Yetman, not by the Wisconsin Board, (3) relevant caselaw supporting the Department's position only applied if the sister state's order was "silent" as to whether it was imposing discipline, which was the

case here, and that (4) the Department's "reason for discipline" was not related to the Act's purpose.

¶ 25    In November 2014, the Administrative Law Judge (ALJ) denied Dr. Yetman's motion to dismiss the Department's complaint against him, relying primarily on *Gross v. Department of Financial & Professional Regulation*, 2011 IL App (1st) 103101. The ALJ concluded that, under *Gross*, which will be discussed in more detail below, the surrender of Dr. Yetman's Wisconsin license was "disciplinary," within the meaning of the Medical Practice Act, that the Wisconsin Board would have regarded the same action as disciplinary if it had been taken by a sister state's licensing board, and that the license surrender was akin to a plea of *nolo contendere* where Dr. Yetman did not admit to any wrongdoing but accepted the consequences that would have followed had the charges brought against him been proven.

¶ 26                              2. Vacatur Motion

¶ 27    In December 2018, Dr. Yetman moved to vacate the temporary suspension of his Illinois medical license, arguing the suspension violated the Medical Practice Act and his due process rights because he posed no "immediate danger" to the public and was denied a "pre-deprivation hearing," among other reasons.[1] Dr. Yetman supported the vacatur motion with his resume, letters from medical disciplinary authorities in Massachusetts and New York stating those states declined to discipline his licenses based on the Wisconsin Board's order, a new affidavit from Mr. Thexton stating the Wisconsin Board's order "did not constitute discipline under Wisconsin law," and copies of unpublished Illinois court decisions *LaBrot v. Illinois Department of Financial and Professional Regulation*, 2018 IL App (4th) 160938-U and *Cadogan v. Division of*

---

[1]Dr. Yetman's motion to vacate the temporary suspension of his license was never ruled on; instead, the temporary suspension remained in effect until the final administrative decision was issued on September 16, 2020.

*Professional Regulation*, 2013 IL App (1st) 122160-U. Although those decisions are unpublished, Dr. Yetman claimed the doctrine of collateral estoppel applied such that he could rely on the decisions to support his claims, as will be discussed more below.

¶ 28                                3. Motions *in limine*

¶ 29    In August 2019, the Department filed two motions *in limine*. The first motion sought to bar Dr. Yetman's arguments based on the *LaBrot* and *Cadogan* cases as those decisions were issued before January 2021, were unpublished and therefore nonprecedential. The second motion sought to bar Dr. Yetman from presenting arguments based on Mr. Thexton's most recent affidavit because, according to the Department, the affidavit contained inadmissible hearsay statements since Dr. Yetman was offering them as evidence to prove the truth of the matter asserted.

¶ 30    In response, Dr. Yetman argued, in the main, that *LaBrot* and *Cadogan* could be considered under the doctrine of collateral estoppel and that Mr. Thexton's affidavit was admissible under the Illinois Administrative Procedure Act since the affidavit was evidence "of a type commonly relied upon by reasonably prudent men in the conduct of their affairs," an exception for otherwise inadmissible hearsay evidence. Finally, Dr. Yetman argued that fairness required admission of Mr. Thexton's affidavit, even if it consisted of inadmissible hearsay statements, since the Department was allowed to admit Dr. Zachariah's affidavit.

¶ 31    The ALJ granted the Department's motions *in limine* and issued a decision recommending that Dr. Yetman's license be "removed from indefinite suspension status" and "placed in refuse to renew status." In reaching its decision, the ALJ found that collateral estoppel did not apply because Dr. Yetman was trying to cite *LaBrot* and *Cadogan* as "binding precedent," rather than on the basis of claim preclusion. Additionally, Mr. Thexton's affidavit

could not be relied upon since it was being offered for the "truth of the matter asserted," not to lay the foundation for business records, like the Department did with the affidavit of Dr. Zachariah.

¶ 32    Furthermore, the ALJ found that the Wisconsin Board's order constituted "disciplinary action," within the meaning of the Medical Practice Act, under the *Gross* decision and applicable Wisconsin statutes. Additionally, disciplining Dr. Yetman's Illinois license was consistent with the purpose of the Medical Practice Act, *i.e.*, to safeguard the public, even though his license had already expired. The ALJ gave little weight to the fact that other states declined to discipline Dr. Yetman's medical license based on the Wisconsin order because there was little to no information about "the standard of review utilized, the totality of evidence reviewed, or the statutes relied upon to decide [those] respective courses of action" taken by those states. Finally, the ALJ considered factors in aggravation and mitigation. While the ALJ found there were no mitigating factors, the ALJ found there were a number of aggravating factors, including the seriousness of multiple offenses and violations of the Medical Practice Act (namely, the deaths of Patients A and B and Dr. Yetman's failure to report his Wisconsin license suspension and stipulation to the Department).

¶ 33                            4. ALJ Hearing

¶ 34    Th ALJ held a formal hearing on the Department's complaint against Dr. Yetman, beginning on September 17, 2019.

¶ 35    At the hearing, Dr. Yetman argued, in the main, that the Wisconsin Board's order was not "disciplinary" for purposes of the Medical Practice Act, and even if it was, imposing further discipline on his Illinois license would be unduly harsh since the temporary suspension of his license was "more than enough" discipline to satisfy the Act's purpose. Dr. Yetman submitted a

third letter from another state (Pennsylvania) that declined to discipline his license based on the Wisconsin Board's order.

¶ 36    The Department submitted an official copy of the Wisconsin Board's order and stipulation. Both were authenticated by Beth Crampton, the Records Custodian of the Division of Legal Services and Compliance for the Wisconsin Department of Safety and Professional Services.

¶ 37                                  5. ALJ's Decision

¶ 38    In October 2019, the ALJ issued a decision recommending that Dr. Yetman's Illinois medical license be "removed from indefinite suspension status" and "placed in refuse to renew status." In reaching his decision, the ALJ found that the action taken in Wisconsin was disciplinary in nature and that disciplining Dr. Yetman's Illinois license was consistent with the Medical Practice Act's purpose, notwithstanding that Dr. Yetman's license had expired and Dr. Yetman's testimony that he had no intention of renewing it. The ALJ noted the Act's language was discretionary in that it permitted the Department to take any disciplinary action it deemed appropriate, and that the Department was not "bound to mimic" either the discipline imposed by the Wisconsin Board or the lack of discipline imposed by other states. Finally, the ALJ found that Dr. Yetman's "offense" was serious because (1) he could no longer practice medicine in Wisconsin and (2) he failed to notify the Department of Wisconsin's discipline which "deprived the citizens of Illinois from timely knowing" that he could not practice medicine in Wisconsin. The ALJ found these constituted factors in aggravation while he also found there was no evidence of factors in mitigation in the record.

¶ 39                          6. Medical Disciplinary Board's Decision

¶ 40    In November 2019, the Department's Medical Disciplinary Board issued a decision adopting the ALJ's recommended decision. Dr. Yetman moved for rehearing, renewing his earlier arguments. The Department responded and Dr. Yetman replied, both renewing their earlier arguments mentioned above.

¶ 41    In September 2020, the Director issued a final administrative decision denying Dr. Yetman's motion for rehearing. The Director also adopted the Medical Disciplinary Board's decision.

¶ 42                              7. Instant Action for Administrative Review

¶ 43    In October 2020, Dr. Yetman filed the instant complaint for administrative review against the Department and its acting director in the circuit court of Cook County. The parties filed memorandums in support of their respective positions, each setting forth similar arguments to those mentioned above. On July 28, 2021, the circuit court entered an order affirming the Director's decision. In reaching its conclusion, the court found that the decision was "neither against the manifest weight of the evidence nor clearly erroneous."

¶ 44    Dr. Yetman moved to reconsider the court's ruling, arguing that the court did not make sufficient findings on the issues. Dr. Yetman also argued, for the first time, that the case should be remanded to the Department so that it could consider "new evidence" concerning the dispositions of the two medical malpractice cases brought against him by Patients A and B. Last, Dr. Yetman argued that the Department should be required to remove from its website any mention of his temporary license suspension to avoid the appearance that he had been "sanctioned twice." To support his motion, Dr. Yetman attached a jury verdict form finding that he was not "negligent in his care and treatment" of Patient A on the date of surgery, as well as a dismissal order and a release stating that the case involving Patient B settled for $20,000.

¶ 45    In response, the Department argued, in the main, that Dr. Yetman's new evidence was untimely and "neither material or relevant." Specifically, the administrative review hearing was conducted more than a month after the jury verdict in Patient A's case was entered, thus making the evidence untimely. Additionally, the evidence was not relevant because the "outcome of civil cases does not and cannot affect whether the Wisconsin Order is discipline under Illinois law, or whether [Dr. Yetman] failed to report it." Finally, the Department asserted that Dr. Yetman's argument regarding the removal of his temporary license suspension from the Department's website was improper as it was raised for the first time in a motion to reconsider.

¶ 46    Dr. Yetman replied that the Medical Board should be allowed to decide for itself the effect of the dispositions in the medical malpractice cases and that the dispositions established "mitigating circumstance[s]" in that they showed no patient was harmed.

¶ 47    In March 2022, following arguments from the parties, the circuit court denied Dr. Yetman's motion to reconsider. The court concluded that the "new evidence" failed to meet the standards for either a motion to reconsider or remand as the jury verdict was issued before the administrative hearing, and therefore did not constitute "new evidence," and the dismissal order was not "material" since the settlement of Patient B's case did "not show a lack of harm to the patient and, in fact, show[ed] quite the opposite." This appeal followed.

¶ 48                                      II. ANALYSIS

¶ 49    The Director's decision, which adopted the ALJ's recommendations, is an administrative decision and judicial review is governed by Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). *Crittenden v. Cook County Commission on Human Rights*, 2012 IL App (1st) 112437, ¶ 40. In reviewing a final administrative decision, we review the Director's decision, not the ALJ's or circuit court's decision. *Id*. "The standard of review depends on the question

- 13 -

presented; this court reviews factual questions under the manifest weight of the evidence standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard." *Masood v. Division of Professional Regulation of Department of Finance & Professional Regulation*, 2023 IL App (1st) 220657, ¶ 47. Because Dr. Yetman does not challenge on appeal any of the Director's factual findings, however, the manifest weight standard of review does not apply in this case.

¶ 50                                    A. Disciplinary Action

¶ 51    Turning the merits of the case before us, we first address Dr. Yetman's argument that the Department erroneously determined that the Wisconsin Board's order was a "disciplinary action," within the meaning of section 22(A)(12) of the Medical Practice Act.

¶ 52    Initially, the parties disagree about the appropriate standard of review. Dr. Yetman asserts the *de novo* standard applies to this issue since it requires us to interpret statutes, whereas the Department asserts that the clearly erroneous standard applies to the issue since it involves the application of section 22(A)(12) of the Medical Practice Act to the undisputed facts in this case. We agree with the Department that the clearly erroneous standard applies in reviewing the Department's decision. See *Gross*, 2011 IL App (1st) 103101, ¶ 13 (reviewing the Department's decision that applied section 22(A)(12) of the Medical Practice Act to undisputed facts for clear error). "An agency decision is clearly erroneous only where a review of the record leaves the court with a 'definite and firm conviction that a mistake has been committed.' " *Oleszczuk v. Department of Employment Security*, 336 Ill. App. 3d 46, 50-51 (2002) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746, 766 (1948)).

¶ 53    Section 22(A) of the Medical Practice Act provides, "[t]he Department may revoke, suspend, place on probation, reprimand, refuse to issue or renew, or take any other disciplinary

or non-disciplinary action as the Department may deem proper with regard to the license or permit of any person issued under this Act, including imposing fines not to exceed $10,000 for each violation" upon 44 different grounds. 225 ILCS 60/22(A) (West 2012). One of those grounds provides, as relevant here, that the Department may take disciplinary action based on "[a]dverse action taken by another state or jurisdiction against a license or other authorization to practice as a medical doctor, ***, a certified copy of the record of the action taken by the other state or jurisdiction being prima facie evidence thereof." 225 ILCS 60/22(A)(12). Furthermore, "[t]his includes any adverse action taken by a State or federal agency that prohibits a medical doctor *** from providing services to the agency's participants." *Id*.

¶ 54     After reviewing the record in this case, we cannot say the Department's decision that the Wisconsin Board's order constituted "disciplinary action" was clearly erroneous. In reaching our decision, we find *Gross* to be dispositive of the issue. In *Gross*, this court considered whether an agreed order by the State of Colorado placing the plaintiff-doctor's medical license on permanent inactive status qualified as "disciplinary action" for the purpose of imposing reciprocal discipline on the doctor's Illinois license under section 22(A)(12) of the Medical Practice Act. *Gross*, 2011 IL App (1st) 103101, ¶ 2. The court ultimately held that, even though the Colorado Board did not impose discipline on the doctor (since it settled with the doctor), the Department did not commit clear error in concluding that the Colorado Board had taken "disciplinary action" against the doctor's license, within the meaning of the Medical Practice Act. *Id*. ¶ 24. The court's holding was based on three facts that it determined satisfied section 2 of the Medical Practice Act: (1) the Colorado Board's action that placed the doctor's license in inactive status qualified as "practice modification" since it restricted him from practicing in Colorado; (2) the Colorado Board would regard the action as disciplinary under Colorado law if another state's board took similar action

against the doctor; and (3) the parties expressly agreed that their "agreed order" "had the same force and effect as an order entered after formal disciplinary hearing." *Id*. ¶¶ 18-20.

¶ 55 Finally, the *Gross* court observed that the parties' agreed order was similar to a plea of *nolo contendere* because the doctor did not admit that he committed the charged misconduct but "accepted, as a consequence of the charges, a restriction on his license that precluded him from actively practicing in Colorado." *Id*. ¶ 21. And, under the Medical Practice Act, the Department may discipline a physician based on "[a] plea of guilty or nolo contendere." *Id*. ¶ 22 (citing 225 ILCS 60/22(A)(3) (West 2008)). While the *Gross* court found that section of the Medical Practice Act did not "directly apply," the court found it "indicates that the Department will treat a failure to contest charges in other states as grounds for disciplining a physician in Illinois." *Gross*, 2011 IL App (1st) 103101, ¶ 22.

¶ 56 Similarly, here, the Wisconsin Board's order clearly modified Dr. Yetman's practice since it accepted both the surrender of Dr. Yetman's license and his waiver of his right to renew his license, facts that were noted by the ALJ. Second, the Wisconsin Board would regard the action as disciplinary under Wisconsin law if a sister state's board took similar action against Dr. Yetman because Wisconsin law in effect at the time (which is similar to current Wisconsin law in effect) provided that "adverse action" included "the surrender of a credential, whether or not accompanied by findings of negligence or unprofessional conduct." Wis. Admin. Code § Med 10.02(2)(q) (2012). Third, while the parties did not expressly agree that the stipulation "had the same force and effect as an order entered after [a] formal disciplinary hearing," as was the case in *Gross*, Dr. Yetman's stipulation was similar to a plea of *nolo contendere* because Dr. Yetman denied "any unprofessional conduct" but agreed to the stipulation to avoid formal charges brought against him.

¶ 57    Because the facts here were substantially similar to those in *Gross*, we likewise conclude that the Director did not commit clear error in concluding that the Wisconsin Board's order constituted "disciplinary action," within the meaning of the Medical Practice Act. *Id*. ¶ 24. Moreover, since Illinois law supports our conclusion, we need not address the other authorities cited by the Department to support its argument that no clear error occurred.

¶ 58                                    1. Thexton Affidavit

¶ 59    Dr. Yetman, nevertheless, argues that the Wisconsin Board's order is not a "disciplinary action" based on Mr. Thexton's affidavit, which he argues, should have been admitted by the ALJ because it was the type of evidence "commonly relied upon by reasonably prudent men in the conduct of their affairs," thereby overcoming traditional hearsay exclusions.

¶ 60    In response, the Department argues that the ALJ properly declined to admit Mr. Thexton's affidavit as inadmissible hearsay evidence because Dr. Yetman intended to rely on the affidavit for the truth of the matter asserted in order to "to vacate the Temporary Suspension Order." Specifically, Dr. Yetman intended to rely on Mr. Thexton's statements in his affidavit that:

> "The stipulation resulted in the Final Decision and Order by the Wisconsin Medical Examining Board, which I drafted, that accepted the surrender of the license, but the resulting order did not impose discipline on Dr. Yetman under Wisconsin law. This was my intent at the time, and the intent of the Board."

We agree with the Department that the affidavit was properly excluded.

¶ 61    The rules adopted by the Department for administrative proceedings provide, *inter alia*, that "[t]he rules of evidence and privilege as applied in civil cases in the circuit courts of this State shall be followed." Additionally, "[e]vidence not admissible under those rules of evidence

may be admitted, however, except when precluded by statute, if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." 68 Ill. Adm. Code 1110.220(a) (2018). "Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). In general, this type of evidence is inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant, unless such evidence falls within an exception to the hearsay rule. *Crittenden*, 2012 IL App (1st) 112437, ¶ 62.

¶ 62    An administrative agency's decision regarding the conduct of its hearing and the introduction of evidence is properly governed by an abuse of discretion standard and will not be reversed unless there is demonstrable prejudice to the party." *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003). In the case at bar, the Director's decision to not admit Mr. Thexton's affidavit did not constitute reversible error.

¶ 63    Here, Dr. Yetman sought to rely on Mr. Thexton's affidavit "to vacate the Temporary Suspension Order" based on Mr. Thexton's statement that no discipline was imposed on Dr. Yetman by the Wisconsin Board's order. Because Dr. Yetman wanted to rely on Mr. Thexton's statement for the truth of the matter asserted (*i.e.*, that no discipline was imposed), the affidavit constituted inadmissible hearsay evidence under Illinois law. Although Dr. Yetman argues that Mr. Thexton's affidavit was admissible as the type of evidence "commonly relied upon by reasonably prudent men in the conduct of their affairs," he has not shown that the Department would not have been prejudiced by the admission and the Department's inability to cross-examine Mr. Thexton.

¶ 64    Furthermore, the record demonstrates that the Department would have been prejudiced by its inability to cross-examine Mr. Thexton had his affidavit been admitted. For example, Mr.

Thexton's affidavit stated that the Wisconsin Board's order "did not impose discipline on Dr. Yetman under Wisconsin law," but it did not indicate whether Mr. Thexton was referring to formal or informal disciple (or neither). Based on the stipulation that Dr. Yetman agreed to in order to avoid formal charges brought against him, it would appear that Mr. Thexton was referring to formal disciple not being imposed on Dr. Yetman. Without being able to cross-examine Mr. Thexton, however, the parties can only offer speculation as to what type of discipline was (or was not) imposed. Likewise, if Mr. Thexton's affidavit had been admitted to prove that no discipline was imposed on Dr. Yetman, this would have substantially prejudiced the Department since the Department would not have been able to cross-examine Mr. Thexton to clarify apparent contradictions between his affidavit and the stipulation.

¶ 65     For the reasons set forth above, we conclude that the ALJ did not abuse its discretion in refusing to admit Mr. Thexton's affidavit. We decline to address Dr. Yetman's remaining arguments that the affidavit was improperly admitted because (1) the ALJ was unfamiliar with Wisconsin law, and (2) the ALJ admitted two of the Department's affidavits, which, according to Dr. Yetman, was improper, as those arguments are not legally developed and are thus subject to forfeiture. See *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 (2007) (noting that a reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and cohesive legal arguments presented as the appellate court is not a depository in which the appellant may dump the burden of argument and research).

¶ 66                                              2. *LaBrot* and *Cadogan* cases

¶ 67     Dr. Yetman also argues that the ALJ should have considered the unpublished *LaBrot* and *Codogan* decisions as controlling authority based on the doctrine of collateral estoppel. Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) provides that an unpublished order issued before

January 1, 2021, "is not precedential except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." "An unpublished decision can be cited for collateral estoppel purposes when a party seeks to use matter from the unpublished decision to establish certain facts or issues in the present case, provided that the elements of collateral estoppel are otherwise met." *Moruzzi v. CCC Services, Inc.*, 2020 IL App (2d) 190411, ¶ 40. Collateral estoppel applies only if (1) the issue decided in the prior litigation is identical to the one presented in the current case, (2) there was a final adjudication on the merits in the prior case, and (3) the party against whom estoppel was asserted was a party, or was in privity with a party, to the prior litigation. *Id*.

¶ 68     Dr. Yetman maintains that each element is satisfied here because (1) the issues in *LaBrot* and *Cadogan* are nearly identical to the present issue, namely, whether sanctions on an Illinois license based on a sister state's discipline serves the Medical Practice Act's purpose of protecting the health and welfare of Illinois citizens, (2) the prior adjudications were final judgments on the merits, and (3) the Department was either a party to or in privity with the parties in *LaBrot* and *Cadogan*. We disagree. While those cases involved similar issues to those before us, they were not identical. Both cases contained different facts and issues, including different sister states, different disciplines imposed, different doctors, and different alleged violations and misconduct.

¶ 69     For example, in the *LaBrot* case, there were mitigating factors like the doctor's unblemished 36-year career as a chiropractor, his community service record, and perhaps most importantly, the fact that no harm to a patient had been alleged. *LaBrot*, 2018 IL App (4th) 160938-U, ¶ 47. In light of those mitigating circumstances, the *LaBrot* court held the aggravating factors did not justify the sanctions imposed against the doctor. *Id*. ¶ 49. Likewise, in *Cadogan*, there were several mitigating factors present and the primary issue was whether the sanctions

imposed were unduly harsh in relation to the alleged misconduct of reporting violations in violation of the Medical Practice Act. *Cadogan*, 2013 IL App (1st) 122160-U, ¶ 33. Because the sister state already had its own reporting requirements, the *Cadogan* court ultimately held the sanctions imposed on the physician were too severe under the circumstances. *Id*. The facts in *LaBrot* and *Cadogan*, however, drastically differed from those before us. Here, Dr. Yetman was accused of serious harm to Patients A and B and there were no mitigating factors. To suggest the issues in *LaBrot* and *Cadogan* were identical to those here would be to lump all challenges to license modifications based on a sister state's discipline in the same category, and we decline to do.

¶ 70                                    B. "Refuse to Renew" Status

¶ 71     Next, Dr. Yetman raises a number of challenges to the propriety of the sanction imposed by the Director. See *Masood*, 2023 IL App (1st) 220657, ¶ 82 (reviewing the propriety of a particular sanction imposed by the Director for an abuse of discretion). "The Director abuses his or her discretion when a sanction is imposed that is (1) overly harsh, arbitrary or unreasonable in view of the mitigating circumstances or (2) unrelated to the purpose of the statute." *Id*. Furthermore, as the reviewing court, we must defer to the administrative agency's expertise and experience in determining what sanctions are appropriate to protect the public interest. *Id*.

¶ 72     After reviewing the record in this case and deferring to the Director's expertise and experience, as we must, we cannot say that the Director abused her discretion when she placed Dr. Yetman's license in "refuse to renew" status. The Director here relied on, among other things, the seriousness of Dr. Yetman's alleged violations concerning his two former now deceased patients, the harm to those patients and the public, and the fact that he had no record of success since both patients died after Dr. Yetman performed surgery on them in the beginning of

his career. Since Dr. Yetman settled Patient B's case, there was no determination of the facts underlying that patient's death for the Director to consider. While Dr. Yetman argues the settlement demonstrated a lack of harm to Patient B, we agree with the circuit court that it showed "quite the opposite." As set forth above (*supra* ¶ 44), Dr. Yetman settled Patient B's case against him for $20,000. This suggests that Patient B was harmed in some way; otherwise, presumably, Dr. Yetman would not have settled the matter. At the very least, the settlement is not evidence of no harm against the patient, as Dr. Yetman has suggested.

¶ 73    Furthermore, it bears noting the Director found that Dr. Yetman's failure to report the voluntary surrender of his Wisconsin license to Illinois deprived Illinoisans from knowing that Dr. Yetman could no longer practice medicine in Wisconsin. By placing Dr. Yetman's license in refuse to renew status, the Director kept him from practicing medicine in Illinois until he provided the Department with proof that he posed no significant risk the public. This was an appropriate safeguard to prevent further harm to the public given the seriousness of the alleged violations. Last, the record reveals there was no mitigating evidence presented at Dr. Yetman's hearing for the Director to consider.

¶ 74    Based on the above factors that were relied on by the Director in imposing this sanction, we find the sanction imposed on Dr. Yetman was reasonable and served the Medical Practice Act's purpose to protect the public. Accordingly, we find no abuse of discretion occurred.

¶ 75                                   C. License Suspension

¶ 76    Finally, Dr. Yetman argues that the temporary suspension of his Illinois medical license violated his due process rights because he was denied proper notice and a pre-deprivation hearing. As set forth above, the Director imposed a temporary suspension on Dr. Yetman's license pending the final hearing.

¶ 77     The Department asserts, and we agree, that Dr. Yetman's challenge to the temporary license suspension is moot. An issue on appeal is moot if no actual controversy exists or if events have occurred that make it impossible to grant the complaining party effectual relief. *Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 539 (2005). Generally, courts will not consider moot or abstract questions or render advisory decisions. *Id*. at 540.  Since the temporary suspension, Dr. Yetman's license has been indefinitely suspended and placed in "refuse to renew" status. Moreover, Dr. Yetman has not identified in his briefs any effectual relief that we can grant him from the temporary suspension.

¶ 78     Mootness aside, we cannot say that Dr. Yetman's due process rights have been violated by the temporary suspension of his medical license. "Administrative proceedings are governed by the fundamental principles and requirements of due process of law." *Sharma v. Division of Professional Regulation of Department of Financial & Professional Regulation*, 2023 IL App (3d) 220095, ¶ 18. An administrative hearing comports with due process if the parties are given (1) the opportunity to be heard, (2) the right to cross-examine adverse witnesses, and (3) impartiality in ruling on the evidence. *Id*. A court, however, will only find a due process violation if there is a showing of prejudice. *Id*. Because a claimed due process violation presents a question of law, our review is *de novo*. *Id*.

¶ 79     Dr. Yetman contends that his due process rights were violated because "[t]here was no extraordinary or emergency situation" that justified a pre-hearing suspension of his license. We disagree. The Department's authority to temporarily suspend a physician's license lies within section 37(d) of the Medical Practice Act. That section provides, "[t]he Secretary, after consultation with the Chief Medical Coordinator or Deputy Medical Coordinator, may temporarily suspend the license of a physician without a hearing, simultaneously with the

institution of proceedings for a hearing provided under this Section if the Secretary finds that evidence in his or her possession indicates that a physician's continuation in practice would constitute an immediate danger to the public." 225 ILCS 60/37(d) (West 2012). Additionally, "[i]n the event that the Secretary suspends, temporarily, the license of a physician without a hearing, a hearing by the Medical Board shall be held within 15 days after such suspension has occurred and shall be concluded without appreciable delay." *Id.*

¶ 80    Here, the Director held an *ex parte* hearing on the Department's petition for temporary suspension of Dr. Yetman's license. The Director ultimately concluded that "the public interest, safety and welfare imperatively require emergency action to prevent the continued practice of Sean M. Yetman, M.D., *** in that [his] actions constitute an immediate danger to public." Before reaching that conclusion, the Director heard testimony from Dr. Zachariah, the Chief Medical Coordinator, who opined as to why he believed Dr. Yetman posed a risk to the public. Dr. Zachariah testified that the allegations against Dr. Yetman were serious, and serious enough that Dr. Yetman "opted to surrender his license" in Wisconsin. Moreover, as set forth, the Department scheduled an initial hearing on the administrative complaint nine days after the *ex parte* hearing, within the Medical Practice Act's 15-day time period, but Dr. Yetman subsequently continued the matter several times (see *supra* ¶ 20).

¶ 81    The foregoing shows that the Director complied with the Medical Practice Act's requirements in temporarily suspending Dr. Yetman's license pending the final administrative hearing. While Dr. Yetman contends the Department should have first conducted an investigation to determine if he was even practicing medicine in Illinois, that is not what the law requires. Moreover, Dr. Yetman was granted a full hearing nine days later, but he chose to continue the matter. To the extent Dr. Yetman asserts he posed no immediate danger to the

public of Illinois since he never practiced in the state, this ignores that Dr. Yetman could have practiced in Illinois if he chose to do so as long as his license remained in effect. In other words, the public was at risk as long as Dr. Yetman's Illinois medical license remained active.

¶ 82    In sum, we conclude that the Director did not commit clear error in concluding that the Wisconsin Board's order constituted "disciplinary action," within the meaning of the Medical Practice Act, since the order modified Dr. Yetman's ability to practice medicine in Wisconsin. Additionally, the ALJ's evidentiary rulings did not amount to an abuse of discretion and Dr. Yetman's due process rights were not violated. To the extent we did not address some of Dr. Yetman's numerous arguments on appeal, it is because they are so poorly set out that they fail to merit further attention and are subject to forfeiture. *In re Estate of Parker*, 2011 IL App (1st) 102871, ¶ 47; *Express Valet, Inc.*, 373 Ill. App. 3d at 855.

¶ 83                                III. CONCLUSION

¶ 84    Based on the foregoing, we affirm the judgment of the circuit court confirming the Director's decision to refuse to renew Dr. Yetman's Illinois medical license.

¶ 85    Affirmed.